UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

HERMA GOPON-ROSEL,

        Plaintiff,

   v.

PLASTICS ENGINEERING COMPANY,          Case No. 07-CV-0323

and

PLASTICS ENGINEERING COMPANY
EMPLOYEE WELFARE PLAN,

        Defendants.

## DECISION AND ORDER

    Plaintiff Herma Gopon-Rosel originally brought this action in state court against Plastics Engineering Company ("Plenco"), alleging a claim for negligent misrepresentation in connection with her late husband's life insurance policy, which Plenco offered as an employee benefit. Defendant removed the case to this court on the ground that the claim was preempted by, and therefore arose under, ERISA. After removal, plaintiff amended her complaint to state claims for estoppel and breach of fiduciary duty under ERISA, and added the Plenco Employee Welfare Plan as a defendant. Defendants now move for summary judgment, arguing that they do not owe plaintiff benefits because her husband did not have life insurance at the time of his death.

### I. BACKGROUND

    Plenco hired plaintiff's late husband Gustav Gopon ("Gustav") in 2004. As a regular, full-time employee, Gustav was eligible to participate in Plenco's normal employee

benefits, one of which was Plenco's group term life insurance plan. At this point, the record becomes muddled. The parties refer in their briefs to "the Plan" – apparently meaning a plan to provide life insurance to Plenco employees as a fringe benefit – but to the extent that such a plan exists in written form, the parties have not identified it. The only thing that might be the Plan that I can find in the record is a copy of a group life insurance policy that lists Plenco as the policyholder. (Aug. 1, 2008, Davis Aff., Ex. B.) Although this policy might be part of the Plan, see, e.g., Sperandeo v. Lorillard Tobacco Co., 460 F.3d 866, 870 (7th Cir. 2006), neither party has clarified whether the policy is what they mean when they say "the Plan," and an insurance policy usually is not itself "the Plan," Pegram v. Herdrich, 530 U.S. 211, 223 (2000). Further, the parties occasionally refer to a "Summary Plan Description" ("SPD"), which, if it existed, undoubtedly would be part of the Plan, but the SPD is not in the record.

Although they do not identify the Plan, the parties agree that it is "offered only to Plenco's full-time employees through an insurance policy underwritten by [an insurance company]." (See Defs.' PFOF ¶ 4 & Pl.'s Resp. (no dispute as to material statements, although name of underwriter is disputed).) The Plan is "sponsored" by Plenco and "administered" by a third-party, Assurant Employee Benefits. (Id.) The parties also agree that, under the Plan, Gustav was entitled to company-paid life insurance with a death benefit in the amount of his annual salary, up to a maximum of $100,000. In addition, Gustav had the opportunity to, and did, purchase supplemental life insurance with an additional $100,000 death benefit.

Because Plenco provided the group term life insurance as an employee benefit, Gustav did not have to pay premiums on the initial benefit of up to $100,000. However,

2

Case 2:07-cv-00323-LA   Filed 01/20/09   Page 2 of 16   Document 58

because this fringe benefit was taxable, federal tax regulations required that Gustav recognize "imputed income" representing the benefit, the amount of which was determined pursuant to a specific IRS formula. Plenco's normal practice was to reflect this imputed income on an employee's pay stub as an addition to income and, because the imputed income is never paid to the employee as cash, to show a corresponding deduction on the pay stub. Plenco's practice with respect to the supplemental life insurance was different. Employees who elected to purchase supplemental coverage had to pay the premiums through payroll deductions. Thus, Plenco noted a deduction on the employee's pay stub in the amount of the premiums for supplemental coverage.

On May 4, 2006, Plenco terminated Gustav's employment. As part of his termination, Plenco provided Gustav with a severance package.[1] On May 5, 2006, a written severance agreement was executed, which provided in pertinent part as follows:

> 1. **Continuation of Pay.** Plenco will continue to pay Gopon at his final rate of pay from the date of Gopon's signing this Agreement through December 31, 2006. Pay shall be subject to withholding agreed to by Gopon. Pay for any dates after May 4, 2006, shall not qualify for a contribution to the Retirement and Savings Plan for Employees of Plastics Engineering Company. Due to the involvement of Federal law (COBRA), continuation of health insurance benefits will be dealt with under separate procedures. **All other benefits will terminate as per the provisions of their respective plans.**

(Aug. 1, 2008, Davis Aff., Ex. A (emphasis added).) Defendants contend that one of "the plans" mentioned in the emphasized sentence was the group term life insurance policy, and plaintiff does not dispute this contention. (Defs.' PFOF ¶ 8; Pl's Resp. ¶ 8 (no dispute).) The relevant termination provisions of the life insurance policy state that:

---

[1] No one contends that the severance package is itself subject to ERISA, or that it matters whether it is.

Your insurance will end on the date:

. . . .

• You stop *active work* . . . .

(Aug. 1, 2008, Davis Aff., Ex. B at p. 8.) The policy defines "active work" as "expenditure of time and energy for the policyholder [i.e., Plenco] . . . at your usual place of business on a *full time* basis." (Id. at p. 3.) "Full-time" is defined as working at least 32 hours per week. (Id.)

Based on the above provisions, Gustav's coverage under the policy terminated in May 2006, on the date that he stopped active work. Upon his termination, however, Gustav had the option to convert the group policy to an individual policy. The policy provided that "[i]f any or all of your group life insurance ends you can apply for any individual coverage offered by us [i.e., the insurance company, not Plenco] . . . . You must apply and pay the premium within 31 days." (Defs.' PFOF ¶ 9.)

The day following Gustav's termination, Plenco faxed a notice of termination and request for conversion forms to Assurant, the third-party administrator. However, for unknown reasons, Assurant did not send the forms to the Gopons. On June 27, 2006, Gustav informed Plenco that he had not received the conversion forms. Plenco then contacted Assurant regarding the conversion forms and re-faxed a copy of its original request for conversion forms to Assurant. However, in September 2006, Gustav again called Plenco and stated that he had not received the conversion forms. Plenco followed up with Assurant, which finally sent the conversion forms to the Gopons on September 11, 2006.

4

Because of the delay in sending the conversion forms, Assurant's cover letter informed the Gopons that if they elected to convert, the policy would have an effective date of May 6, 2006, but that the Gopons would, upon conversion, owe five-months' worth of back premiums (i.e. premiums going back to the date of Gustav's termination). The letter also stated that if the Gopons wanted to convert, the forms had to be returned by September 25, 2006. However, the Gopons never completed and returned the conversion forms.

During the time that the Gopons were repeatedly requesting the conversion forms, Plenco was sending Gustav severance checks in accordance with the severance agreement. Although Gustav's coverage under the group life insurance policy terminated in early May, the pay stub attached to the severance checks continued to show imputed income for life insurance in the amount of $32.25. Because Plenco was no longer paying life insurance premiums for Gustav, and thus Gustav was no longer receiving imputed income, this was an erroneous notation. Although the pay stub was erroneous with respect to the initial $100,000 death benefit, it correctly reflected no deductions for the supplemental benefits that Gustav paid for while he was an employee. The pay stub, with the relevant entries enclosed in rectangles, looked like this:

5

| Pay Type | Hours | Current | YTD | Deduction | Current | YTD |
|---|---|---|---|---|---|---|
| Group Term Life | | 32.25 | 612.75 | 401K | | 3,303.59 |
| Insurance Credit | | 50.00 | 950.00 | Dental Ins | 29.17 | 554.23 |
| LTD Ins Credit | | | 246.87 | Group Term Life | 32.25 | 612.75 |
| Reg | | | 39,300.58 | HCRA | | 400.00 |
| Severance pay | | 4,011.86 | 44,130.46 | LTD Ins Credit | | 246.87 |
| Unused vacation | | | 1,994.22 | Medical Ins | 161.92 | 3,076.48 |
| | | | | Sup Life - EE | | 220.50 |
| | | | | United Way | | 100.00 |
| | | | | Vacation Purcha | | 369.48 |

(Aug. 1, 2008, Davis Aff., Ex. D.)

Plenco believes that the erroneous imputed income notation for group term life was the result of "an administrative oversight apparently caused by miscommunication between Plenco's Vice President of Human Resources [John Brotz] and its paymaster [i.e., the person at Plenco in charge of sending out paychecks, Dan Peterson]." (Defs.' PFOF ¶ 13.) Plaintiff argues that the notation was included on the pay stubs because "John Brotz told Dan Peterson that Gustav would continue to have life insurance coverage in place through November 5, 2006." (Pl.'s Resp to Defs.' PFOF ¶ 13.)

On September 19, 2006, just days after receiving the conversion forms from Assurant, plaintiff contacted Plenco about the notation on Gustav's severance checks. Plaintiff was confused by the notation in light of the letter from Assurant regarding termination and conversion. Plaintiff spoke with Plenco's benefits coordinator, Mary Ellis, who told plaintiff that it was her understanding that the Gopons were still covered by life insurance, but that plaintiff should check with Dan Peterson to confirm.[2] As noted, Dan

---

[2]Plenco disputes that any Plenco employee told plaintiff that she had coverage, but for purposes of summary judgment I accept plaintiff's version of the conversations.

6

Peterson is responsible for issuing paychecks to Plenco employees. Plaintiff spoke with him after speaking with Ellis, and he also said that he thought the Gopons were covered, but that plaintiff should check with John Brotz to confirm.

John Brotz, Plenco's Vice President of Human Resources, was on an extended trip to Germany at the time of plaintiff's call. He and plaintiff never spoke about the matter until after Gustav's death. When Brotz did speak to plaintiff, he explained that he did not return from Germany until two weeks after her call, and that he did not immediately address her inquiry on his return because he had other work to do and thought he could resolve plaintiff's issue later. On October 12, 2006, before Brotz had investigated the imputed income notations, Plenco sent another regular severance check to Gustav with the same erroneous notation for imputed income on the stub.

Two days later, on October 14, 2006, Gustav committed suicide. Plaintiff then applied for life insurance benefits under both the group life and supplemental life insurance policies. However, Gustav never converted the group policy to an individual policy, and thus no coverage was in effect when he died. Accordingly, the insurance company denied plaintiff's claim.

On March 7, 2007, plaintiff filed the present action and, after removal and amendments to her pleadings, asserted claims of estoppel and breach of fiduciary duty under ERISA against Plenco and "the Plan," relying heavily on the erroneous imputed income notation on Gustav's severance checks.

## II. DISCUSSION

In addressing defendants' motion for summary judgment, I view the facts in the light most favorable to plaintiff. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S.

7

574, 587 (1986). I may grant the motion only if no reasonable fact-finder could find for plaintiff. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). I address plaintiff's estoppel and breach of fiduciary duty claims in turn.

**A.     Estoppel**

In order to prevail on an estoppel claim under ERISA, plaintiff must show that Plenco made (1) a knowing misrepresentation, (2) in writing, (3) on which she relied, (4) to her detriment. Vallone v. CNA Fin. Corp., 375 F.3d 623, 639 (7th Cir. 2004). A knowing oral misrepresentation can provide the basis for an estoppel claim only if the plan in question is ambiguous or misleading. Bowerman v. Wal-Mart Stores, Inc., 226 F.3d 574, 586-89 (7th Cir. 2000).

Plaintiff first argues that the misrepresentations necessary to establish her estoppel claim did not have to be in writing because the Plan documents were ambiguous, in that they failed to provide adequate information regarding severance agreements. First of all, the court does not know what plaintiff means when she says that "the Plan documents" were ambiguous. Again, the only potential Plan document in the record is the group life insurance policy. But the policy is perfectly clear. Although it does not specifically address severance agreements, its termination provisions contain no ambiguity about what happens when an employee is terminated but receives severance pay. In that circumstance, because the employee is no longer engaged in full-time, active work (i.e., 32 hours per week), coverage is terminated. The terminated employee has the option to convert the policy to an individual policy and pay the premiums, but that does not make anything about the termination provisions ambiguous. Accordingly, the policy is not ambiguous. Since plaintiff has pointed to no other potential plan document containing an

8

ambiguity, she may not rely on alleged oral misrepresentations to establish her estoppel claim. Only knowing, written misrepresentations will do.

Plaintiff next argues that the erroneous imputed income notations on Gustav's severance checks constituted written misrepresentations. Plaintiff further argues that a fact-finder could reasonably infer that the notations were knowing misrepresentations rather than clerical errors.

Plaintiff seems to argue that to prove that the misrepresentations were made knowingly, all she has to do is prove that Plenco, as an entity, made the misrepresentations with knowledge (imputed to it through the knowledge of its employees) that they were false. Under plaintiff's theory, she would not need to prove that any single employee of Plenco intended to mislead her into thinking that Gustav had life insurance. Rather, all she would have to prove is that one Plenco employee knew that Gustav did not have life insurance, and that a separate employee knew that Gustav's pay stubs indicated that Gustav did have life insurance. When the knowledge of these separate employees is added together and imputed to Plenco, the result, argues plaintiff, is a knowing misrepresentation made by Plenco, even though no single person at Plenco knew that the information on the pay stub was wrong.

However, plaintiff's theory fails because a "knowing misrepresentation" requires proof of intent to mislead, see Coker v. Trans World Airlines, Inc., 165 F.3d 579, 586 (7th Cir. 1999) (knowing misrepresentation requires that defendant "intentionally set out to mislead" plaintiff), and intent to mislead cannot be imputed to a company when none of its employees had such intent. An employee's intent to mislead can be imputed to the employer (provided that the conditions for imputing a deliberate wrong to an employer are

9

satisfied), but an employer cannot be deemed to have intent to mislead based on the aggregate knowledge of two separate employees, neither of whom, on his or her own, had intent to mislead. See Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 707-09 (7th Cir. 2008) (explaining that "[i]ntent to deceive is not a corporate attribute" and that a series of acts done by employees without scienter cannot result in a finding of scienter against the company). This is why in a recent Seventh Circuit case concerning estoppel in the ERISA context, Kannapien v. Quaker Oats Co., the court focused on whether "any Quaker employee knowingly misrepresented the terms of [the Plan]," rather than on whether Quaker, as an entity, did so. 507 F.3d 629, 636 (7th Cir 2007) (emphasis added).

Accordingly, plaintiff can prevail only if she can prove that a Plenco employee intended to mislead her into thinking that Gustav's life insurance was still in effect. However, there is no hint that anyone at Plenco harbored such intent. Even resolving all factual disputes in plaintiff's favor, the most that can be said is that John Brotz may have erroneously thought that Gustav's life insurance would be in effect until November 5, 2006. Brotz communicated this belief to Peterson, who then continued to note imputed income on Gustav's severance pay stubs. There is no evidence that at the time Brotz allegedly told Peterson that Gustav's life insurance would continue until November 5, Brotz knew that Gustav's insurance had already terminated.[3] Nor is there any evidence that Peterson knew that coverage had terminated when he continued to note the imputed income.

---

[3] In her response to defendants' proposed findings of fact, Plaintiff argues that Brotz "knew or should have known" that Gustav was no longer covered. (Resp. To Defs.' PFOF ¶ 13.) However, the cited evidence does not suggest that Brotz either knew or should have known that he was not covered, and whether he "should have known" is irrelevant, because the dispositive question is whether he did know.

10

The only other Plenco employee involved, Mary Ellis, was the person who faxed the insurance termination papers to Assurant on the day that Plenco terminated Gustav's employment, May 5, 2006. When plaintiff called Mary Ellis on September 19, 2006 regarding the erroneous pay stub notations, Mary Ellis supposedly said that she thought that coverage was still in effect, but that plaintiff should check with others to confirm her belief. Plaintiff argues that it can be inferred from the fact that Mary Ellis sent the termination fax on May 5 that she knew she was giving false information to plaintiff four months later, on September 19. However, it is quite clear that, if Mary Ellis did indeed tell plaintiff that Gustav's coverage was still effective, Mary Ellis did not intend to mislead plaintiff, and that when she spoke to plaintiff, she either simply did not remember sending the earlier fax or did not fully appreciate what the fax meant. Had Ellis wanted to mislead plaintiff, she would not have told her to check with others to confirm her belief that coverage was still in effect; instead, she would have told plaintiff that she was covered and then hung up.

Plaintiff also argues that a reasonable fact-finder could infer from Plenco's failure to correct the pay stub error even after plaintiff brought it to both Mary Elllis and Dan Peterson's attention that someone at Plenco sought to mislead the Gopons. (Recall that the last erroneous notation appeared on Gustav's October 12 pay stub, which Plenco generated twenty-three days after plaintiff asked Elllis and Peterson about the notations.) However, there is no evidence that anyone at Plenco investigated the matter before October 12, confirmed that the notation was erroneous, but then decided to continue making erroneous notations on Gustav's pay stubs anyway.

11

Finally, and most importantly, plaintiff's failure to identify any potential motive for deceiving the Gopons eliminates any remaining possibility that a reasonable fact-finder could infer intent to mislead from the above facts. Why would anyone at Plenco have wanted to trick the Gopons into thinking they had life insurance when, in fact, they did not? Plaintiff offers no suggestions, and I can think of none. In the absence of any motive for deception, a reasonable fact-finder would need overwhelming evidence to conclude that someone at Plenco had intent to mislead and that the erroneous notations were not simply the result of "bureaucratic sloppiness." Coker, 165 F.3d at 586 (holding that "bureaucratic sloppiness" is not knowing misrepresentation). However, as discussed, there is no such evidence in the record. Plaintiffs' estoppel claim therefore fails.

**B.     Breach of Fiduciary Duty**

Plaintiff next argues that by making the erroneous pay stub notations and failing to clarify the resulting confusion before Gustav's death, the Plan fiduciaries breached their fiduciary duty to "communicate material facts affecting the interests of plan participants or beneficiaries." Bowerman, 226 F.3d at 590. In order to prevail on a breach of fiduciary duty claim under ERISA, plaintiff must show (1) that a defendant is a fiduciary; (2) that it breached its duty as a fiduciary; and (3) that the breach caused harm to an ERISA participant or beneficiary. Kannapien., 507 F.3d at 636.

Plaintiff's claim falters on the first element because she has not established that a reasonable fact-finder could conclude that either of the defendants – Plenco or the Plenco Welfare Plan – were fiduciaries.[4] To be a fiduciary under ERISA, one must have a

---

[4]Plaintiff does not contend that the Plan was a fiduciary of itself, and so I address only whether Plenco was a fiduciary.

12

"managerial, investment, or discretionary role" in connection with the plan. Kannapien, 507 F.3d at 639.[5] Persons who perform only ministerial or clerical functions relating to the administration of the plan are not plan fiduciaries. Schmidt v. Sheet Metal Workers' Nat'l Pension Fund, 128 F.3d 541, 547 (7th Cir. 1997).

In the present case, no admissible evidence identifies the Plan's fiduciary or fiduciaries. Again, "the Plan" is not in the record, and although the group term life insurance policy is, the policy itself does not identify any fiduciaries. To be sure, plaintiff alleges that "[t]he Plan lists . . . Plenco and John Brotz as Plan Administrator and Agent for Service of Legal Process" (Second Am. Compl. ¶ 10),[6] and defendants do not deny this allegation,[7] but plaintiff has pointed to no evidence establishing that the "Plan Administrator and Agent for Service of Legal Process" had any discretionary authority with respect to the Plan. Further, defendants have denied that either Plenco or any of its employees were

---

[5]ERISA provides that "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

[6]Plaintiff has not explained what she means by "the Plan" in ¶ 10. No document identifying Plenco or Brotz as plan administrators is in the record.

[7]Defendants answered ¶ 10 by pleading that "[t]he Plan is a writing that speaks for itself and any attempt to characterize or mischaracterize the information contained therein is denied." This is not a proper response to an allegation of fact. Fed. R. Civ. P. 8(b) provides that a defendant must "admit or deny the allegations asserted against it." Plaintiff alleged that a writing says something, and defendants' obligation was to either admit or deny that the writing says what plaintiff alleged it says. Pleading that the writing speaks for itself, especially when, as here, the writing is not attached to the pleading, is improper. If defendants thought that the allegation mischaracterized the writing, they should have denied it outright. Therefore, pursuant to Fed. R. Civ. P. 8(b)(6), defendants have admitted the allegations of ¶ 10 of the Second Amended Complaint.

13

plan fiduciaries. (Second Am. Compl. ¶ 33; Answer ¶ 33.) Although plan administrators often are fiduciaries, persons bearing the title "Plan Administrator" are not necessarily plan fiduciaries. See Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund, 390 F.3d 1040, 1047-48 (7th Cir. 2004) (holding that designating person "plan administrator" does not transform him or her into a fiduciary); Pohl v. Nat'l Benefits Consultants, Inc., 956 F.2d 126, 128-29 (7th Cir. 1992) (finding that plan administrator was not plan fiduciary); Jayne E. Zanglein & Susan J. Stabile, ERISA Litigation 176 n.66 (2d ed. 2005) ("[M]any persons call themselves 'plan administrators,' although they do not necessarily have any discretionary authority or responsibility. These people are not fiduciaries if they do not meet the requirements of [ERISA].").

Here, plaintiff has pointed to no evidence suggesting that having the title "Plan Administrator" meant that Plenco or Brotz had the kind of discretionary authority necessary to make them "fiduciaries" within the meaning of ERISA.[8] Further, plaintiff has pointed to no evidence showing that anyone involved in this case exercised any discretion with respect to the Plan. All that can be inferred from the record is that Ellis, Peterson and Brotz were involved in ministerial tasks with respect to the Plan, such as notifying the third-party administrator when a participant's employment had been terminated, computing the amount of imputed income earned by a participant for tax purposes, and reporting the

---

[8]Also, Brotz is not a defendant, and plaintiff has developed no argument in favor of the proposition that a breach of fiduciary duty by Brotz could be imputed to either defendant. In any event, as noted in the text, plaintiff has not established that Brotz was a fiduciary.

14

imputed income on the participant's pay stub.[9] In other words, as far as the record reveals, all these individuals did was carry out the day-to-day administration of the Plan, which does not make them fiduciaries. Tegtmeier, 390 F.3d at 1047. None had the power to set Plan policy, construe ambiguous Plan terms, manage Plan assets, or adopt any practices or procedures with respect to Plan management. Cf. 29 C.F.R. § 2509.75-8 (Department of Labor guidance regarding functions that can make persons plan fiduciaries).

Perhaps Plenco had these powers, but no evidence suggests that it did. All that the record reveals about Plenco is that it was the Plan sponsor and one of its "administrators," and that it purchased the group term life insurance policy and paid premiums on behalf of certain employees. Plaintiff has not argued that purchasing an insurance policy sufficed to make Plenco a fiduciary who had a duty to communicate information about the Plan to participants and beneficiaries,[10] and therefore I do not have the benefit of briefing on this issue. For this reason, I deem the argument forfeited and do not address it.

Because plaintiff has failed to raise an issue of fact concerning whether any defendant was a plan fiduciary, defendants are entitled to summary judgment.

### III. CONCLUSION

---

[9]Indeed, the calculation of imputed income and preparation of Gustav's pay stub, although ministerial acts, were not even acts taken in connection with Plan administration. Rather, they were ministerial acts taken in connection with the administration of Plenco's tax and payroll obligations.

[10]Purchasing an insurance policy may make an employer a fiduciary with respect to management of plan assets, since an insurance policy might be deemed a plan asset, but that does not make the employer a fiduciary who has a duty to communicate information about plan terms. A person who is a plan fiduciary for some purposes is not necessarily a fiduciary for all purposes. See, e.g., Leigh v. Engle, 727 F.2d 113, 133 (7th Cir. 1984) ("ERISA recognizes that a person may be a fiduciary for some purposes and not others.").

15

For the reasons stated, **IT IS ORDERED** that defendants' motion for summary judgment is **GRANTED**. The clerk of court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 17 day of January, 2009.

/s_____
LYNN ADELMAN
District Court Judge